IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br>    vs.<br><br><br>HECTOR RENTERIA,<br><br>    Defendant. | ORDER AND MEMORANDUM<br>DECISION<br><br><br>Case No. 2:14-CR-275-TC<br><br><br>Judge Tena Campbell |

On May 11, 2016, a jury convicted Defendant Hector Renteria of three counts of drug distribution (counts one, two, and four) and one count (count three) of aiding and abetting in the carrying of a firearm in relation to the drug-trafficking offenses charged in counts one and two.

Mr. Renteria has now filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. In this motion, Mr. Renteria challenges the jury's verdict on count three. He contends the evidence was not sufficient to

show that he had the intent to participate in the entire crime, nor that the firearm was carried during and in relation to the drug-trafficking offenses.

As explained below, the court concludes that the evidence was sufficient for a reasonable jury to find Mr. Renteria guilty of aiding and abetting in the carrying of a firearm in relation to the drug-trafficking offenses.

## **BACKGROUND**

Count three against Mr. Renteria involves a November 14, 2013, drug sale. The United States' theory was that Mr. Renteria sold heroin, methamphetamine, and a shotgun to a confidential source nicknamed "Grimace."[1] Mr. Renteria did not deliver the drugs and shotgun personally to Grimace but instead used his drug-trafficking confederate, Ralph Martinez, to make the delivery.

### The November 14, 2013, Telephone Calls

The transaction began with a telephone call on November 14, 2013, from Grimace to Mr. Renteria.  The call was recorded:

(phone ringing)

Renteria:          Hello?

_____

[1] Grimace did not testify at trial.

Source:             What up?

Renteria:           What up funky status.

Source:             What you doin G funk?

Renteria:           (Laughs) . . . Burns a stoke. (UI)

Source:             Hey did you check on that uh gauge for me?

Renteria:           Uh yeah, I'll go check it out today for sure.

Source:             K yeah cause I need it bad bro.

Renteria:           Well . . .

Source:             I need one bad.

Renteria:           Alright well let me um, well you gonna pay the homie fifty bucks to take it over there?

Source:             Yeah.

Renteria:           Alright hold up now.

Source:             K and then alright let's just get, let's just start, let's just do one, just one and one.  One clear and one black.

Renteria:           Alright well you gotta the fetya for that right?

Source:             Yeah, I got it.  What's what's the damage though. Is it different, the same, what?

Renteria:           It's basically you know . . .

3

| | |
|---|---|
| Source: | Nine and six? |
| Renteria: | I could, do it for that yeah. |
| Source: | (Laughs) |
| Renteria: | Fuck it I could do it for that yeah. |
| Source: | K.  Well where you at, where do you wanna do this?  Do you wanna . . . I gotta go to . . . |
| Renteria: | (OV) I'll, I'll, I'll talk to my guy already and then he, he'll call you right. |
| Source: | Okay call me.  Alright bye. |
| Renteria: | Alright peace. |
| Source: | Alright peace . . . . |

End of Phone call.

(CS Call to Hector Renteria, Trial Ex. 3A.)

The United States called Ralph Martinez as a witness.  Mr. Martinez listened to the recording and identified the speakers as Grimace and Mr. Renteria. Mr. Martinez explained that a "gauge" was a shotgun.  (Trial Tr. 7-8, May 10, 2016.)   He also explained that "one and one" meant one ounce of methamphetamine and one ounce of heroin: "One ounce of clear," was one ounce of methamphetamine, and "one ounce of black," was one ounce heroin.  (Id. at 8.)

4

"Fetya" according to Mr. Martinez is money.  (Id.)  Mr. Martinez testified that when Mr. Renteria and Grimace spoke about "the damage," they were discussing the price of the drugs:  $900 for the heroin and $600 for the methamphetamine. (Id. at 9.)

The next recorded conversation, also on November 14, 2013, was between Mr. Martinez and Grimace.  In that conversation the two men decided on a place to meet:

| | |
|---|---|
| Source: | I can meet you somewhere real fast. |
| Martinez: | Cool uh . . . |
| Source: | Where you at? |
| Martinez: | I'm just leavin fuckin West Valley right now headin up that way to grab that fuckin thing. |
| Source: | K.  Well . . . |
| Martinez: | Um . . . You wanna just meet me over there on Monarch? |
| Source: | Yeah, where's that at? |
| Martinez: | It's off of tenth north and Valentine. |
| Source: | Tenth north and off of Redwood? |
| Martinez: | Off of Valentine Street. |

5

Source:          Valentine Street.

Martinez:        Yeah you know where the Smith's is?  If you keep goin all the way straight up to tenth north on that where the light is?

Source:          Uh huh (affirmation).

Martinez:        You take your left, uh a left onto ten north and it's your first right, right there it's called Valentine Street.

Source:          K or can you meet me at Sutherlands?  Cause I gotta go there and get some lumber.  If not I can do that, that's cool whatever.

Martinez:        Uhh fuck I don't wanna go to Sutherlands.

Source:          (Laughs) . . . alright.  So tenth north and Valentine.

Martinez:        Valentine Street.  It's right before the light right there on fuckin um before that fuckin Chinese Church.

Source:          The Chinese Church?

Martinez:        Yeah ten north.

Source:          Tenth north the Chinese ch...

Martinez:        Ten north at where the Smith's is you know what I mean?

Source:          That's not tenth north, that's sixth north, the Smiths.

6

| | |
|---|---|
| Martinez: | No, I know. |
| Source: | Oh. |
| Martinez: | The church is on ten north. |
| Source: | Right, tenth north, oh, oh okay.  Yeah, yeah, yeah it used to be the old library.  Yeah. |
| Martinez: | Yeah, it's right there around the corner right there. |
| Source: | Okay and Valentine Street.  I swear to God man I seen that street. |
| Martinez: | Yeah Valentine Street.  Alright. |
| Source: | K I'll call you when I get right there.  How long? |
| Martinez: | Uh I'll be there in like ten minutes.  I just jumpin on the freeway. |
| Source: | Okay I'll call ya when I get right there if I get lost. |
| Martinez: | Alright. |
| Source: | Alright bet. |

(CS Call to Ralph Martinez, Trial Ex. 3B.)

Mr. Martinez testified that he was not surprised when he received the telephone call from Grimace.  As Mr. Martinez testified, "[Mr. Renteria] called

me just before then and told me to give Grimace the old shotgun and an ounce of meth and an ounce of heroin." (Trial Tr. 9-10.) No recording was made of that telephone call.

Mr. Martinez testified that he delivered the drugs and the firearm to Grimace that day. The Government then played a recording of the delivery:

| | |
|---|---|
| Martinez: | Hello? |
| Source: | Hey. |
| Martinez: | What's up? |
| Source: | Where you at? |
| Martinez: | I'm right here. |
| Source: | Okay now you say it's ten thousand what? K, k I'm comin down tenth north right now. |
| Martinez; | It's Valentine. |
| Source: | It is just pas... |
| Martinez: | (UI) |
| Source: | So it's just, it's just past the school? |
| Martinez: | Yeah. |
| Source: | So then k so I'm headed towards the mountain is it east past those . . . |

Martinez:       It's twelve twenty west.

Source:         Okay.

Martinez:       Twelve twentieth west.  Valentine Street.

Source:         Orale.  Orale.  That's what I needed to know.  K and then I turn left and head north?

Martinez:       Yeah head north like you're gonna come close to some Mormon church and you'll see my car.

Source:         Okay.  I'll see you in a minute.  Alright bye.

Source:         Wanna come in or what?  Or what you wanna do?

Source:         That's how you like it right?

Martinez:       Hell yeah.  (Laughs)

Source:         E-Easy.

Martinez:       Fuck yeah that's the way you do it bra [sic].

                (Rustling-Snapping of rubber bands-UI)

Source:         Here dude.  (UI rustling) Well look here.  You don't have forty one?  Then just I'll get you um, just get me on the next one then.  So . . .

Martinez:       No I don't have no more.

Source:         Just here take this and you just owe me forty dude.  Or just tell em take forty off my bill.

Martinez:       (UI) I can do that man probably.

9

Source:          It's good.  Hold on I gotta catch this.

                 (Rustling-UI)

Source:          Even in red Nigga what?

Martinez:        (UI) fucking wrong with that shit dog.  I'll drop a
                 fuckin oozie and chop you up.

Source:          This?

Martinez:        Yep.  That's twenty ten.

Source:          (UI)

Martinez:        Nope.  Gracias.

Source:          K.  On the next, I owe you forty.  (UI)

Martinez:        You want this forty five?

Source:          Yeah.  That's right yeah you owe me forty I
                 mean.

                 (Rustling UI - mumbling in back ground and music)

Source:          Are we done?  Blow us up!  I don't have (UI)

                 (Loud music in the back ground)

Source:          (UI) you got that forty or did you wanna just
                 bring, I could just bring it to you.  How much
                 (UI) anyways?

Martinez:        (UI) How long you stayin?

10

Source:          Thirty minutes.

Martinez:        Hit me up.

Source:          It's down.  I just gotta go meet my boy real quick.

Martinez:        Alright.

Source:          Alright peace.

          (Source walking back to vehicle)

Source:          Alright, alright headed, gonna get out of here.

Source:          You're welcome.  You're welcome.

(CS and Ralph Martinez Body Wire, Trial Ex. 3C.)

Mr. Martinez explained to the jury what they had heard:

A:     Grimace is pulling up to my mother's house and I am giving
       him a 12 gauge shotgun and the ounce of meth and the ounce
       of heroin.

Q:     Describe exactly what you're doing with the drugs and the
       shotgun, please.

A:     Selling them to him basically.

Q:     How are you physically carrying them?

A:     I have the shotgun wrapped in a red sheet, and I am just taking
       it to his truck and putting it in his backseat.

11

Q:     How did you get it from your mother's house to the truck and to the backseat?

A:     Just carried it outside.

Q:     In your arms?

A:     Yes.

Q:     Did you receive money in exchange for these things?

A:     I did.

(Trial Tr. at 11.)

Mr. Martinez later delivered the money from Grimace to Mr. Renteria.

## ANALYSIS

**Legal Standard**

To uphold a jury's verdict of guilty, the evidence must be such that, when viewed in a light most favorable to the Government, a reasonable jury could find a defendant guilty beyond a reasonable doubt.   United States v. Morales, 108 F.3d 1213, 1221 (10th Cir. 1997).  "The evidence of guilt must be substantial." Id.  (citation and internal quotation marks omitted).

**Aiding and Abetting a Violation of 18 U.S.C. § 924(c)(1)**

Count 3 of the Superseding Indictment charged Mr. Renteria with a violation of 18 U.S.C. § 924 (c)(1) and 18 U.S.C. § 2. (Sup. Ind., ECF No. 76.)

Section 924(c)(1) requires the imposition of specified penalties if a defendant, "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm." To succeed in bringing a charge under section 924 (c)(1) for aiding and abetting, the Government must prove that "the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission." <u>Rosemond v. United States</u>, 134 S. Ct. 1240, 124 (2014).

At trial and in the court's instructions to the jury, the Government's theory was that Mr. Renteria aided and abetted in  "carrying," not  "using," a firearm during and in relation to the drug-trafficking offenses alleged in counts 1 and 2. (<u>See</u> Jury Inst. No. 18., ECF No. 92.)

<u>Affirmative Act</u>

Because Mr. Renteria did not deliver the drugs and gun to Grimace himself, but instead used his drug-trafficking confederate Mr. Martinez, the analysis begins with looking at the standard for proving aiding and abetting a violation under section 924(c). The Supreme Court in <u>Rosemond v. United States</u> addressed this issue. 134 S. Ct. 1240. There, both the Government and the defendant agreed that "a person is liable . . .  for aiding and abetting a crime if

13

(and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." Id. at 1245.

The court held that a defendant would satisfy the affirmative-act component if he participated in either the drug trafficking or the use or carrying of the firearm. Id. at 1247.

Here, neither party disputes that Mr. Renteria took affirmative acts when he agreed to sell or give the shotgun to Grimace, sell drugs to Grimace, and coordinate the delivery of the shotgun and drugs to Grimace. Instead, Mr. Renteria argues that the Government failed to prove intent.

Intent

"[A] defendant may be convicted of aiding and abetting a § 924(c) violation only if his intent reaches beyond a simple drug sale, to an armed one." Id. at 1248. The Supreme Court elaborated: "An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun." Id. at 1249. But the defendant must have advance knowledge:

> For all that to be true, though, the § 924(c) defendant's knowledge of a firearm must be advance knowledge—or otherwise said, knowledge that enables him to make the relevant legal (and indeed, moral) choice. When an accomplice knows beforehand of

a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense.   But when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime.   And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun.

Id.

Here, Mr. Renteria focuses on the time requirement, contending that "the government failed to present any proof, direct or circumstantial, that Mr. Renteria intended or knew that Martinez would deliver the firearm at the same time as he was delivering the drugs and thereby facilitate the commission of the drug crime." (Mot. & Mem. for J. of Acquittal 4, ECF. No 98.)   Mr. Renteria continues his argument by noting that "[t]he lack of connection between the drugs and the shotgun is demonstrated by the other two [distribution-of-methamphetamine] transactions, counts 4 and 5.   Martinez was not armed with any weapon on either occasion." Id. at 4–5.

The Government acknowledges that it must show Mr. Renteria knew in advance that Mr. Martinez would deliver the shotgun and the drugs to Grimace

together.[2] According to the Government, the following evidence supports the jury's conclusion:

> (1) Grimace ordered the shotgun and the drugs in a single phone call; (2) Defendant directed Martinez to deliver the shotgun and the drugs to Grimace in a single phone call; (3) Martinez, in fact, delivered the shotgun and drugs to Grimace at the same time; (4) Grimace paid for the shotgun and drugs during a single transaction; and (5) Martinez remitted the money for both the shotgun and drugs to Defendant at the same time.

(Gov't's Resp. in Opp'n to Def.'s Mot. & Mem for J. & Acquittal. Opp. 9, ECF. No. 99.)

Moreover, the two conversations between Mr. Martinez and Grimace show that both men had to drive to the meeting place. Each man would, at separate times, be carrying contraband in his car: Mr. Martinez would bring the drugs and gun to the meeting place; Grimace would be driving away with the gun and drugs. Common sense dictates that none of those involved—neither Mr. Martinez, Grimace, nor Mr. Renteria—would want to double the risk or double the time

---

[2] The court correctly instructed the jury that the government must prove that Mr. Renteria "knew in advance" that Mr. Martinez would carry a firearm "in relation to" the drug transaction. (Jury Inst. No. 18., ECF.No.92.)

taken by having Mr. Martinez and Grimace make two separate trips carrying contraband.

A reasonable jury, considering all the evidence in the light most favorable to the Government, could find that Mr. Renteria intended in advance that Mr. Martinez deliver the shotgun and the drugs to Grimace at the same time.

### During and in Relation to

Now that the court has analyzed the intent necessary to aid and abet a section 924(c) violation, the court turns to what the Government must show to establish that the gun was carried "during and in relation to" the drug-trafficking offenses.

The phrase "during and in relation to" is "expansive." Smith v. United States, 508 U.S. 223, 235 (1993). Though the Supreme Court "has described the statute's basic purpose broadly, as an effort to combat the dangerous combination of drugs and guns," it has its boundaries. Muscarello v. United States, 524 U.S. 125, 132 (1993) (citation and internal quotation marks omitted). Section 924(c)'s inclusion of the "during and in relation to" requirement mandates that the Government prove "more than the mere presence of a gun." United States v. Avery, 295 F.3d 1158, 1174 (10th Cir. 2002). The "in relation to" language

requires that the gun "have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Smith, 508 U.S. at 238 (1993). This limitation is meant to allay the concern that "a person could be punished under § 924(c)(1) for committing a drug trafficking offense while in possession of a firearm even though the firearm's presence is coincidental or entirely unrelated to the crime." Id. (citation and internal quotation marks omitted).

Here, the carrying of the shotgun clearly occurred "during" the commission of the drug-trafficking crime: the gun was exchanged along with the drugs. As a result, Mr. Renteria's challenge rests on whether the carrying of the firearm occurred "in relation to" the drug-trafficking crime. The evidence demonstrates that it does.

The evidence shows that Grimace asked first about getting the shotgun and immediately afterwards about buying the drugs. Mr. Renteria gave the gun and the drugs to Mr. Martinez in one transaction, and Mr. Martinez then exchanged the gun and drugs for money with Grimace in one transaction. Nothing about the shotgun's presence appears to be accidental or coincidental. Id. Given this

evidence, a reasonable jury could conclude that the shotgun was carried "during and in relation to" the drug-trafficking offenses.

Other courts, addressing analogous cases, have come to this same conclusion. For example, in United States v. Timmons the defendant first discussed the sale of a laser-sighted pistol with undercover officers over the phone.  283 F.3d 1246, 1248 (11th Cir. 2002).  After agreeing to sell the pistol, the defendant then spoke with the officers and agreed to sell them crack cocaine as well.  Id.  Later that day, the defendant met with the officers and handed them a shoe box containing both the gun and the drugs.  Id. 1248–89. After a jury convicted the defendant for violating section 924(c), the defendant appealed to the Eleventh Circuit, arguing that the pistol was not carried "in relation to" the sale of the crack cocaine.  Id. at 1248.  The Eleventh Circuit rejected the defendant's argument.  Id. at 1252.  It ruled that the defendant carried the gun "during and in relation to" the drug-trafficking offense:

> "[i]f indeed the purpose of the statute is to combat the dangerous combination of drugs and guns, as [the Supreme Court] held, and [the defendant] combined the drugs and gun in a single shoe-box in what essentially amounts to a single transaction, as the jury found, it would flout the purpose of the statute to hold anything but that the gun was carried 'during and in relation' to the drug offense."

19

Id. at 1251–52.

The Eleventh Circuit is not alone in its analysis.  See United States v. Lipford, 203 F.3d 259, 267 (4th Cir. 2000) (ruling that the sale of a firearm and drugs for cash met the in-relation-to test because the sale of the firearm "had at least the potential of attracting [the defendant] into making the sale of the drugs"); United States v. Rivera, 502 F. App'x 554, 558 (6th Cir. 2012) (concluding that where "the [undercover officer] ordered a firearm and drugs, and [the defendant] dutifully delivered the firearm components and drugs as requested, it would indeed flout the purpose of § 924(c)(1)(A) were we to hold that the firearm did not facilitate the drug trafficking offense" and, consequently, that the in-relation-to test was met).

Considering all the evidence here in the light most favorable to the Government, a reasonable jury could find that the shotgun was carried "during and in relation to" the drug-trafficking offenses.

## **ORDER**

Because a reasonable jury, drawing all inferences in a light most favorable to the Government, could find the defendant guilty beyond a reasonable doubt for

violating section 924(c)(1), Mr. Renteria's Motion and Memorandum for Judgment of Acquittal (ECF No. 98) is DENIED.

DATED this 8th day of November, 2016.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge

21